Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

United States District Court District of Eastern Michigan

Detroit Division

| | | |
|---|---|---|
| Trish Cunnigham | ) | Case No. _____ |
| | ) | *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | ) | |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) ) ) ) | Jury Trial: *(check one)* ☒ Yes ☐ No |
| **-v-** | ) | |
| City of Detroit  and Buildings, Safety,Engineering and Environmental Department and Office of  Inclusion and Opportunity | ) ) ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued.  If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | ) ) ) ) | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I.     The Parties to This Complaint

#### A.     The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Trish Cunningham |
| Street Address | 18530 Mack ave #304 |
| City and County | Grosse Pointe, Wayne |
| State and Zip Code | MI 48236 |
| Telephone Number | (313) 316-0246 |
| E-mail Address | mail4trish@gmail.com |

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

**B.      The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | City of Detroit |
| Job or Title *(if known)* | Buildings and Safety Engineering and Environmental Dept. |
| Street Address | 2 Woodward ave Suite 500 |
| City and County | Detroit ,Wayne |
| State and Zip Code | MI 48226 |
| Telephone Number | (313) 224-4550. fax (313) 224-5505 |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | City of Detroit |
| Job or Title *(if known)* | Office of Inclusion and Opportunity |
| Street Address | 2 Woodward ave suite 500 |
| City and County | Detroit, Wayne |
| State and Zip Code | MI,48226 |
| Telephone Number | (313) 224-9376 |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

| Telephone Number | |
|---|---|
| E-mail Address *(if known)* | |

## C. Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| Name | City of Detroit |
|---|---|
| Street Address | 2 Woodward ave |
| City and County | Detroit,Wayne |
| State and Zip Code | MI 48226 |
| Telephone Number | (313) 224-2733 |

## II. Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☒ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

   *(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

   *(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☒ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

   *(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Other federal law *(specify the federal law)*:

☒ Relevant state law *(specify, if known)*:

   Elliott-Larsen Civil Rights Act  act 453

☐ Relevant city or county law *(specify, if known)*:

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- ☐ Failure to hire me.
- ☒ Termination of my employment.
- ☐ Failure to promote me.
- ☐ Failure to accommodate my disability.
- ☒ Unequal terms and conditions of my employment.
- ☐ Retaliation.
- ☒ Other acts *(specify)*: hostile work environment, constructive discharge, disclosing protected medical information.

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B. It is my best recollection that the alleged discriminatory acts occurred on date(s)

8/1/2016 through 3/5/2019

C. I believe that defendant(s) *(check one)*:

- ☐ is/are still committing these acts against me.
- ☒ is/are not still committing these acts against me.

D. Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- ☐ race
- ☐ color
- ☒ gender/sex        female
- ☒ religion        I do not particapate in organized religion and was belived to be gay
- ☐ national origin
- ☐ age *(year of birth)* _____ *(only when asserting a claim of age discrimination.)*
- ☒ disability or perceived disability *(specify disability)*

Myasthenia Gravis

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

E.         The facts of my case are as follows.   .

The discriminatory treatment I received began in the application process. The extra steps required of me to get through the hiring process were triggered by my google profile photo.

I was invited to test.
My offer was immidiately withdrawn.
After I asked how to appeal the withdrawl I was re invited to test.
I was informed I failed an extremely simple test.
I requested my scantron test scores and they were not provided because the test I "failed" was being "graded"

To my knowlege no other building inspector applicant had his testing offer withdrawn nor were they denied testing results.

The message that persons who look like me were not wanted carried over to my first day of employment when I was assigned to the housing inspection department as opposed to the building inspection department, assigned to a supervisor with a known reputation for making women quit, while being assigned to perform the most menial task available "ticket writing". While it is true that men were also assigned to perform this function on a temporary basis, for mature women and myself it was a permanent assignment.

I was denied an opportunity to leave the housing inspection department when details of my Family Medical Leave were disclosed to person(s) in advance of my interview for a mechanical inspector position. Mr Debardino and I had a preliminary interview and he encouraged me to pursue the position but at the second interview he and Glen Davis repeatedly asked me to disclose the nature of the leave and subsequently I was not offered the promotion.

Any building inspector with my credentials would have quit had they been subjected to the ridicule of working as a housing inspector especially when their duties were further limited to admin functions that could been performed by the most entry level administrative assistant. The "ticket writer" position is widely viewed to be a punitive assignment. In my case I endured this postion while being harrassed, and demoted to a lesser position than "ticket writer"

Detroit Buildings, Safety, Engineering and Environmental (BSEED) created a hostile work environment when persons in authority were made aware of the harassment I was enduring on more than 5 occasions both in writing and in person  and made no effort to remedy the situation,  the inaction emboldened my harrasor.

The Office of Inclusion and Opportunity dissuaded me from filing an initial complaint because Lesa Kent told me there was "nothing actionable" in my claims of harassment. Further, when I filed a subsequent charge, it was not investigated.

Successful efforts were made to alienate me from coworkers.

I was denied union representation.

I was treated differently than other licensed building inspectors and the punitive assignment I was given caused damage to my career and self-esteem. I was subjected to this treatment because I was a mature woman, perceived to be gay, with a disability.

I lost pay when I was forced to use my Family Medical leave time when the stress of my working conditions required that I stay home.

I lost the ability to discharge my student loans because I was not allowed to provide 10 continuous years of public service. Now I am too old to start over.

I was prevented from mitigating my losses when forced to leave my job when my application to perform inspections as a third party was declined because I "lacked construction experience". I provided proof of being a licensed general contractor for over 20 years, An Associate's degree in building inspection and International Code Council certifications while none of the other approved vendors were held to the same standard.

Chronology:

1.     In July of 2015 I applied for a Building Inspector position with the City of Detroit.

2.     On August 1, 2016, I was invited to test.

3.     When I responded via email with a question about the test, my google profile picture was displayed and it was apparent that I was a mature woman. The testing offer was immediately withdrawn.

4.     After several exchanges, I asked  how I might formally appeal the withdrawal of the testing invitation.I was re-invited to test.

5.     On August 10, 2016 I tested for the position and two weeks later on August 24, 2016 I was informed that I failed the test.

6.     I asked for a copy of my test results. I was told that my"failed" test had to "graded."

7.     The test was taken with a scantron test form and was graded by computer.

8.     I was asked to submit a request form and I promtly complied.

9.     Over a period of three weeks I continued to ask for my test score.

10.     While no admission of error was offered I was invited to retest.

11.     October 18, 2016 I re-tested and I was invited to interview.

12.     On my second testing date I observed others asking the person administering the test if they had passed and they were given their score immediately. My former manager Eric Johnson told me he received his test score in the same manner.

13.     I was employed by the City of Detroit Buildings, Safety, Engineering, Environmental Department (BSEED) from December 19,2016 through March 5, 2019

14.     I held the position of "Building Inspector.

15.     I started work the same day as Daryl O'Keefe and Joe Schneider.

16.     We were assigned to work in the property maintenance division. This division employed "housing inspectors"

17.     BSEED Housing Inspectors are only required to be high school graduates. No other certifications are required.

18.     We started our employment as "ticket writers"

19.     Those who were assigned the "ticket writer" position were labeled "desk inspectors" and "losers" by housing inspectors.

20.     Building Inspectors would end conversations once they learned you were a "ticket writer"

21.     BSEED building inspectors are required to graduate high school, have 4 years of recent journey level construction experience and to be working towards obtaining "Act 54" certification.

22.     The industry standard for most states requires building inspectors to be certified by International Code Council, (ICC) the agency that writes building codes.

23.     When I obtained ICC certification, my work experience was verified with w-2s and copies of my contractor licenses. After my experience was verified, I was invited to test.

24.     The three hour proctored exams required knowledge of construction and applicability of building codes. I obtained ICC certification in Residential Structural and Residential Mechanical.

25.     In contrast, the building inspector test for BSEED that I "failed" was juvenile.

26.     I applied for "Act 54" certification using only my ICC certifications and $250.00 and was approved within a week.

27.     There was no testing requirement nor any employment verification to obtain "Act 54" certification.

28.     I was one of a handful of building inspectors in BSEED to obtain ICC certification(s).

29.     I understand I was the only building inspector with a degree in building inspection.

30.     I was the only ICC certified building inspector not allowed to inspect buildings. I was also the only mature female building inspector assumed to be gay.

31.     Upon hire none of us possessed an "Act 54" certification.

32.     We were  assigned to work for Ron Muir, a man with a well deserved reputation for harrassing women.

33.     Ron Muir frequently yelled at Ms.Keys, and was never reprimanded.

34.     Ron Muir yelled at me once and was not reprimanded by anyone listening.

35.     I never heard Ron Muir yell at any man.

36.     In February or March of 2017. Ron Muir told me I would be attending a monthly meeting at the health department.

37.     As we were leaving the building he told me I would have to ride with him.

38.     I told him I would prefer to drive my own car.

39.     I was still in my six month probationary period and I hoped to become a permanent employee.

40.     Rather than incur his wrath I went to the meeting with him in his truck.

41.     He ran stopsigns and lights, passed others in the right lane passed over a double yellow line and it was a memorable and intimidating experience.

42.      For the entirety of the drive both to and from the meeting he complained about his live in girlfirend and how she failed to service his needs sexual and otherwise.

43.     He asked about my partner and services I provided.

44.     I declined to discuss my spouse. I did my best to redirect his questions but his insistance made me uncomfortable.

45.     A few days after the meeting he instructed me to complete a mileage log for the date of the meeting stating I had earned mileage reimbursement for driving my car and I refused as I had not taken my car.

46.     I discussed the drive and the mileage slip with Wesley Bush, a coworker whom I believed to be in a postion of authority because he was teaching Daryl O'Keefe, myself and Joe Schneider how to write tickets.

47.     Wesley Bush told me Ron Muir had a long history of abusing female employees and that they "usually quit right away" He also suggested I talk with the Ombudsman about an incident where Ron Muir was being investigated. He further suggested I talk to Chief Johnson.

48.     Ron Muir became more hostile after the mileage log incident.

49.     Ron Muir  would berate me with comments to include "why can't you understand what I'm asking you to do?", "can't you read?"

50.     He would give an order, change it shortly after and the reprimand me for following the new direction.

51.     By March 1,2017 I realized that my plan to work at BSEED for 10 years, retire with a small pension and receive student loan forgiveness came at too high a cost and chose to allow myself to be managed out of my job.

52.     My partner of 8 years and I were struggling. He said that the job was changing me to a "raging bitch" and that he wanted "me" back.

53.     I told Eric Johnson that Ron Muir was a bully and I could no longer work for him.

54.     I tendered my resignation

55.     Eric Johnson would not accept my resignation.

56.     He reassigned me to work for Terry Martin and I understood that the "ticket writer" assignment would be temporary until my "Act 54"certification was processed.

57.     I told my partner that I would no longer work under Ron Muir and that I would be better able to control my temper.

58.     I resigned myself to waiting to be allowed to inspect buildings.

59.      At this point I believed that if I proved my worth, I would be given opportunities to advance.

60.     Instead, I was progressively demoted.

61.     Around this time Joe Schneider was performing semi supervisor duties and no longer a "ticket writer"

62.     From March 2017 through January2018 Eric Johnson shielded me from harassment. I was given opportunities to use my organizational and teambuilding skills to lead projects and create processes.

63.     Although I was denied the opportunity to be a building inspector, Eric Johnson directed my work while I was assigned to Terry Martin.

64.     I devoted time at work and away from work to developing skills that I hoped would move my career forward.

65.     In March of 2017 I was asked to begin work on the ZIP code enforcement project that was to be implemented later in the year.

66.     The enforcement program would rely heavily on a program called Smartsheet. I purchased a personal version of the program and learned how to use it on my own time.

67.     In April Eric Johnson encouraged me to pursue a lead inspection license so I could be assigned to lead the health department lead poisoning enforcement efforts.

68.     I paid for my classes and licensing and Eric Johnson approved my time off to attend classes and testing. I invested about $1,100.00 of my personal funds and obtained a lead inspector/risk assessor and EBL investigator.

69.     In March I lead a corridor survey using my knowledge of the Smartsheet program working with Daryl O'Keefe.

70.     From March of 2017 through August, 2018 I lead as many as 5 co-workers in more than 10 blight surveys and my efforts increased efficiency and accountability.

71.     I received "Act 54" certification in April of 2017.

72.     From April of 2017 through February,2019 I made regular, repeated requests requests to be allowed to leave the Housing Inspection department and assume the duties of my Building Inspection position.

73.     My requests were both informal and in writing and made to Eric Johnson, Dave Bell, Dalit Patel, Dan Debardino, Glen Davis, Arthur Edge and Raymond Scott

74.     Daryl O'Keefe and Joe Schneider and I had lunch together one or twice a week from the time we started working at BSEED.

75.     I often referred to my husband as my "partner" or my "sweetie"

76.     I am from Portland, Oregon and "partner" applies equally to spouses of either gender or married or unmarried unions.

77.     In July if 2017 Daryl and I were having lunch and he mentioned he was thinking about attending a departmental picnic with his wife.

78.     I told him Scott didn't usually like large gatherings.

79.     He looked perplexed and asked is Scott your partner?

80.     I said yes, that's his name.

81.     He said oh, we all thought you were gay.

82.     The antiquated requirements the City of Detroit used for benefits qualification not only denies coverage for same sex spouses and civil unions, it requires employees be married to their spouse and provide a copy of the license to obtain benefits.

83.     I strongly disagreed with this religious bias when I was forced to marry my partner of 10 years to obtain health insurance for his upcoming surgery.

84.     I believe these policies support my belief that it is not ok to be gay and work for the City of Detroit.

85.     I was perceived to be gay by coworkers and supervisors for the first 8 months of my employment.

86.     On December 20,2018 Eric Johnson asked me into his office to discuss a citizen complaint. He warned me that "people were gunning for me" I asked for an explanation. He told me we would talk about it later but not in his office.

87.     The citizen complaint came from a woman who was running an airbnb across the street from my home. Air bnb units were illegal.

88.     I asked Terry Martin, my supervisor to send an inspector to investigate because the noise disrupted my sleep,and that of several neighbors,often for days at a time.

89.     I showed him the Airbnb ads advertising the 3-bedroom one bath home could be occupied by 13 guests. Guests lacking proper toileting facilities were relieving themselves on sidewalks and in neighbor's yards.

90.     I provided Terry Martin with a copy of the airbnb ad, a list of the addresses she owned in the neighborhood and her drivers licence showing a different address to be her residence.

91.     Three neighbors filed complaints and Terry Martin took no action.

92.     I was finally able to convince the district 4 inspector, Samuel Flemings  to investigate and cite the illegal rental.

93.     After Samuel Flemings determined there was an illegal rental  I wrote tickets.

94.     I believe my actions gained his respect because after this he ceased calling me a "desk inspector"

95.     The owner of the illegal rental came into the office wearing hot pants and a halter top and no jacket while it was snowing.

96.     She sat in Terry Martin's office for about an hour after which, all enforcement stopped.

97.     His action stunned me.

98.     Eric Johnson is terminated in January of 2018. We never had an opportunity to discuss his "they are gunning for you" comment

99.     "Ticket writers" were relocated to a courtroom in February of 2017 while our office is being remodeled.

100.    On February 26, 2018 Terry Martin was in his office and complaining loudly about Ms. Keys poor performance.

101.    I sent him an email asking why he would make negative statements behind her back.

102.    I asked what she was doing wrong.

103.    He said she wasn't writing any tickets.

104.    I worked next to Ms. Keys and knew this was not true. I researched the situation and discovered the source of the discrepancy.

105.    Terry Martin gave the ticket writers two lists of tickets to be written. One version was in Excel format the other in Smartsheet. Terry told us to enter the data into the Excel sheet.

106.   It was common knowledge that Terry did not understand the reporting process and it required we enter data into Smartsheet.

107.   He often referred to the database as a "Dumb sheet"

108.   His Smartsheet knowledge base was so limited that he would call me in to his office and tell me to print images for him because he couldn't do it himself.

109.   The "ticket writers" ignored his instruction and instead entered data on the Smartsheet to insure proper tracking.

110.   Ms. Keys followed his instruction and entered her tickets in Excel.

111.   I told Terry that Ms. Keys was following his direction and that was why her tickets weren't visible. He did not like hearing that it was his poor instruction that caused the issue.

112.   On February 23, Terry singled me out and directed me not to post my tickets while other inspectors were allowed to leave the confines of the building and generate additional income via mileage rembursement. In our text exchange that day he inferred I was not perfoming my job correctly.

113.   Terry assigns leadership roles I previously held to Daryl O'Keefe.

114.   Daryl is a capable person and ticket writing wasn't difficult.

115.   I continued to write tickets at a rapid pace until my progress was slowed by Terry Martin assigning Daryl O'keefe to input the names of violators into the system before I before I could write my tickets, inferring that somehow lost the ability to spell..

116.   On March 1, 2018 Terry Martin interrupted a converstation he was having with Wayne Wilkins, another housing inspection supervisor to scold me for clocking out 2 minutes early.

117.   This discipline was given while I was standing in front of Wayne Wilkins and could have waited until he could speak to me privately.

118.   When I clocked out I was sitting in an empty room as all other team members had left to post tickets.

119.   On March 9,2018 Terry took my desk position in a quiet private corner and gave it to a newly hired male.

120.   He assigned the less desirable desks in direct public view to the three women working for him.

121.   I objected strongly about his creation of a "secretarial pool" and questioned the sexist policy of putting all the women together in the least private desks.

122.   In a text I asked for my former desk. "I respectfully request my former spot" his response"you better settle down and I respect decline"

123.   My performance suffered significantly when he made the punitive desk assignment as I no longer had a quiet place to work.

124.   Prior to this desk assignment I was far removed from his conversations.

125.   Now assigned to sit just outside the often open door to his office I could not avoid overhearing

Terry Martins offensive statements.

126. He referred to a city attorney as a "Hot Blonde", he often used rude discriptors in place of names "the busty one" the old bird" replaced actual names.

127. Having worked with men in construction for more than 25 years I am clear about the differences betweeen harmless playful banter and contempt.

128. I now understood that like Ron Muir, Terry had contempt for women.

129. Terry Martin told the EEOC investigator he did not assign me to the desk just outside his door.

130. From my hire date to my last day at work I wrote 5,374 Tickets.

131. Ms. Keys wrote 4,472 tickets.

132. Joe Schneider wrote 13 tickets.

133. Daryl O'Keefe wrote 2,830 tickets.

134. Tickets were written primarily at a desk.

135. Ms. Keys and I were the only mature women assigned to write tickets and our ticket count indicates that we spent considerably more time at our desks than male team members.

136. Unsure if I was being paranoid in feeling Terry Martin staring at my back, I purchased a "makeup mirror" for my computer monitor and realized that I would cringe when he made some of his comments and he was in fact staring at my back almost as if he enjoyed my reaction.

137. This is consistent with what Mark Kincannon observed when he stated "he seemed to go out of his way to harass the CP" when he was interviewed by the EEOC.

138. On March 10, 2018 I received a poor performance evaluation from Terry in which he  stated that I needed to learn how to use a computer.

139. I asked Daryl O'Keefe about his review, and he said it was "great"

140. I noticed a general cooling from what used to be a fun, respectful, relationship between myself and Daryl O'Keefe.

141. On March 13, 2018, I became aware of a deliberate effort on the part of Terry Martin or the person or persons directing him to sabotage me.

142. A few weeks earlier Terry Martin directed me to respond to a citizen complaint and post a correction order on a building at 18600 Woodward Ave.

143. After I did as he directed and when I returned to the office he told me to write tickets.

144. I told him I had just posted the correction order and I had to wait three days before I could write tickets.

145. He asked if I was disobeying his order in a threatening tone.

146.   I followed his direction knowing I was violating the rules.

147.   When the citizen complained he scolded me and said I "should have known better" and he threatened me with discipline for doing as he asked.

148.   In April or May of 2018 Terry Martin sent me into the field for 3 days to perform housing inspections.

149.   Housing inspection was different from Building Inspection and my training was in how to inspect primarily vacant buildings for structural violations.

150.   Nothing in my background prepared me to identify the presence of bedbugs or cockroaches. I had no idea how much accumulated trash in a home was considered a hazard.

151.   I was required to complete housing inspection report forms.

152.   I realized I did not understand housing inspection and Terry Martin did not provide any instruction to me in what was required.

153.   I reached out to Arthur Rushin, another Housing inspection supervisor.

154.   Shortly after I asked Arthur Rushin for help Terry Martin called me into his office and threatened me with termination for asking another supervisor for the help he never offered.

155.   Arthur Rushin sent me out with one of his inspectors for two days.

156.   Terry Martin insisted I return to ticket writing and my housing inspector career ended.

157.   When interviewed, The EEOC investigator asked if anyone was denied training. All current inspectors said they were given required training.

158.   All inspectors attended training sessions in the main auditorium to maintain "Act 54" certifications.

159.   Not all of us received the training we needed to perform our jobs.

160.   In my case I believe it was generally hoped that I would go away and that I wasn't worth the investment.

161.   Daryl O'keefe was given housing inspector training as were all "ticket writers" hired after me.

162.   In April or May of 2017 inspectors were issued small desktop printers and they were to be used in "ticket writers" vehicles.

163.   We were also issued invertors to power the desktop printer and laptop computer. These devices drew significant amperage.

164.   I had just replaced my ECM on my vehicle a few months prior. It was very expensive. I asked my mechanic if the invertor could cause damage to the computer. He told me not to plug the issued device(s) into my car.

165.   I asked Terry Martin to submit a document to a decision maker to insure my car would be repaired if the device caused damage. He refused to do so. Several months later I paid to have my alternator upgraded from 80 amps to 120 to allow the device to be used, provided I didn't use my heater

or air conditioner.

166.   I couldn't manage without air conditioning or heat.

167.   I went into debt to buy a car that could handle the load at significant decrease in fuel economy.

168.   I purchased the vehicle for the sole purpose of meeting the BSEED demand for a vehicle to conduct surveys and post tickets.

169.   On March 23rd I was called in from posting tickets to attend a meeting.

170.   I was excited that there was a new project and understood we would be learning new software and I was so looking forward to getting outdoors.

171.   Daryl, Latisse, Mike and Addison were seated at the table when I entered the room and excitedly asked "what is the new project?

172.   Terry looked at me and in a stern voice said "this meeting is not for you"

173.   I asked why he had called me in to attend the meeting and he glared at me, and I left.

174.   I was embarrassed and upset to have been purposely called in for the sole purpose of being embarrassed.

175.   After this incident I was shunned by all of the "ticket writing team" except for Lou Smith and Ms.Keys.

176.   I had no assigned work from March the meeting on March 23,2018 until Late April 2018

177.   I noticed Louis Smith was not invited to participate in the new project either.

178.   I asked him what he was assigned to do.

179.   He complained that the "ticket writer" position was his punishment.

180.   He didn't say what he was being punished for but did admonish me to never be seen in front of the Mayors office because it would lead to instant termination.

181.   Following Lou Smiths example I busied myself reviewing old correction orders and managed to find some tickets to write.

182.   The other ticket writers were out in the field enjoying Spring and several assignments while was required to punch in and out from desk in front of his office.

183.   On a few occasions, during this time I did post the tickets I wrote.

184.   I was required to "ask" to leave the building to post my tickets.

185.   Other inspectors "told" Terry they were leaving or just dropped their mileage log on the enormous pile of documents on his desk as they were leaving.

186.   To my knowledge, I was the only "ticket writer" required to punch in and out from my desktop.

187.   Time "punches" can be verified as the time log displays whether the employee punched in, or the

supervisor did.

188.   On April 2,2018 Terry asked me for a copy of my daily ticket sheet, a form that no one used anymore because a software upgrade tracked our tickets.

189.   I couldn't find a copy of the form. I asked Lou Smith, Moncey Chaco and Edna Keys if they had a copy I could use. None of them did because, as they said "we don't use it anymore."

190.   I searched emails and found a copy "my" daily ticket form.

191.   In much the same way as I was the only ticket writer stuck at my desk and required to clock in and out from my desk, I was the only inspector required to complete a "daily ticket log"

192.   The daily ticket log is not the same as the daily work log referenced by the EEOC investigator.

193.   The ticket log was initially used by ticket writers and later by only one ticket writer, me.

194.   On April 3,2018 Terry Martin told Randy Hargreaves, a person who supervised building inspectors "I only get the worst of the worst" in reference to his employees.

195.   I was looking forward to the day when I would be allowed to inspect buildings and Terry was telling the person I hoped would become my boss that I was "the worst of the worst!"

196.   On April 3,2018 Shortly after the conversation with Randy Hargreaves, he told a citizen "My guys are just robots. they don't think about why they write tickets" As a ticket writer I was initially offended but in truth, we were treated like robots.

197.   On April 10,2018 when I arrived at work, I found a copy of one of the "daily ticket logs" on my desk in plain view of my coworkers with bold letters large enough to be seen from across the room "WHAT IS THIS" written on the face.

198.   The EEOC investigator asked ticket writers if they saw the document. All current employees denied seeing it.

199.   Shortly after this incident Joe and I, who had been having lunch together once or twice a week since we started suddenly stopped doing so.

200.   On April 30, 2018 at 11:15 I was at my desk and a citizen was was in Terrys office talking about an inspector who had been very helpful. He went on to say she was a woman and Terry interjected, "oh you must mean Monica Sparks" the citizen said no, her name was Trish and Terry asked "are you sure?" He knew I was right outside his door and I saw his reflection in my mirror and he was grinning ear to ear watching me tense up.

201.   While in his office asking for an explanation for his comment to the citizen about me, I noticed a document on top of the pile on his desk.

202.   It was a mileage slip from April 10 2018 and there were many notes written on it indicating my integrity was being questioned.

203.   This was in plain view of citizens and co workers and as there were dried food stains on it. I

204.   It was dated 20 days prior I believe it was clearly visibile for some time.

205.   On April 10, 2018 I sent an email to Dave Bell. I understood he was the person in charge of

BSEED. The subject line read "we need to have a difficult conversation"

206.   Dave Bell invited me to his office that day and I told him that the situation with Terry was becoming unbearable.I told him about Terrys disgusting sexist comments.I told him my job performance was suffering since my quiet desk location was taken and I was forced to work in a traffic corridor.I told him I stacked ticket boxes behind my desk to create a barrier to block the noise and they had been removed.

207.   I asked Dave to allow me to put a bookcase behind my desk for some privacy and noise reduction.

208.   At the meeting Dave Bell told me to keep a keep a record of the sexist comments. I bought a desk diary and recorded most incidents therafter.

209.   Dave Bell did nothing to help me.

210.   On April 16,2018 a remote blight court was set up. The primary questions citizens asked had to do with lead Paint inspections. I was a Lead inspector, Risk assessor and EBL investigator, often with no work to do.

211.    I offered to attend and help educate interested ones in the process.

212.   Every time there was any opportunity for me to showcase any of my skillls I was denied the opportunity.

213.   I have Myashenia Gravis. At the time I applied for the job I had not had an episode in 2 years and had weaned myself from the medication.

214.   I did not wish to disclose my disablilty but the stress of the hostile environment I was working in was triggering frequent episodes requiring bed rest.

215.   On April 16,2018  I was forced to disclose my illness to apply for Intermittent FMLA because I was missing work and had used up all of my sick time.

216.   The leave allowed me to take up to 6 days per month off and not risk losing my job but overall I took far fewer.

217.   The leave was initally for 6 months and was extended another 6 months.

218.   My doctor cited Myasthnia Gravis and work stress as the reason for approved intermittent leave.

219.   To My knowledge no one ever investigated why the stress of my job was making me sick.

220.   May 6, 2018 I send a letter to Dave Bell. I told him "the problem with Terry is greater than I realized and well beyond my ability to solve" and again I asked to be allowed to be a building inspector.

221.   I complained in writing about how sexist policies and discrimination were damaging to my career.I asked for some sort of barrier between my back and Terrys window.

222.   Instead of offering help, Dave Bell reponded with a condescending  inference to feelings.."Despite how you or others "feel" going to buildings division is not a promotion".

223.   Building Inspectors are held in higher esteem than Housing Inspectors.

224.   Bulding Inspectors earn 20K more than housing inspectors.

225.   This is fact in spite of how Dave Bell might "feel"

226.   On May 10, 2018 I spoke with Lesa Kent in the CRIO office and I shared a letter I had sent to Terry Martin and copied to Dave Bell.

227.   We spoke for about an hour. She read the letter and listened to my complaint of demeaning assignments, public humiliation, setting me up for failure and the endless barrage of rude expressions used to describe women.

228.   She summarized my situation with the comment: "we have all had dumb bosses"

229.   I asked her if there was anything actionable in my letter and she told me "nothing actionable"

230.   I allowed her to talk me out of filing a formal complaint as I understood it wouldn't be investigated but might be discovered by my harrassor.

231.   As I left, she asked to retain a copy of the letter I shared with her and it made me hopeful she might do something to help.

232.   She never helped.

233.   On May 16, 2018 Mark Kincannon, a newly hired project manager asked Terry if he could borrow me to help with the implementation of the zip code rental enforcement project. Terry said "only if I worked on comp time".

234.   Mark was working to create an address list for non compliant properties and landlords.

235.   I worked for 110 hours on nights and weekends and lunch from March 16 to June 3 to identify 1250 properties.

236.   I set up the sheets and systems the inspectors used to write tickets for all of 48215 and 48224 zip codes.

237.   I verified mailing addresses for owners of more than 1500 addresses.

238.   I was happy to finally do something that required some limited use of my creative problem solving skills.

239.   I enjoyed working with a "normal man"

240.   May 21, 2018 Daryl Okeefe was promoted to building inspection. He had a solid construction background but I was more qualified, he was a white man of similar age.

241.   Latisse Walton a young black woman was promoted as well around that time.

242.   When she got the transfer notification she yelled at the top of her voice "I am finally getting way from the LOSER department"

243.   Ms. Keys, Louis Smith, Moncey Chaco and Terry Martin and Wayne Wilkins were present. No one corrected her.

244.   I learned later during my Interview with Dan Debardino and Glen Davis Latisse was a court officer, so she had not been promoted, she just changed location.

245. I learned there was another female building inspector and I sought her out after a training/sales presentation and asked her how she liked her job and she told me she liked it but didn't actually perfom inspections as she was a court officer….

246. I now understood that female inspectors were assigned the more feminine position of court officer.

247. May 24, 2018 I have been primarily stuck indoors doing mindless admin tasks since early spring.

248. While visiting the office Daryl O'Keffe,dumped a stack of over 100 correction orders on my desk and I asked what I was supposed to do with them. He said "ask Terry" in a concending tone.

249. This was hurtful as Daryl and I used to have lunches together and shared many stories.

250. Daryl was more politically savvy than I and I believe he realized that being friendly with me could be bad for him.

251. Ticket writers who performed blight surveys wrote the tickets for the correction orders they generated during their surveys.

252. I spoke to Terry and learned I was further demoted to being a ticket writers secretary when I was made to write Daryl's tickets.

253. To make matters worse I could not confirm or deny that citizens had corrected the blight issues because I was not provided the photos taken during the survey.

254. Photos were always used to verify conditions.

255. I was made to look foolish when I wrote tickets for conditons that did not exist or were for a different address than I was provided.

256. May 25, 2018 Terry Martin is speaking with Randy Hargreaves, the supervisor from the buildings division where building inspectors worked, in his office.

257. I am the subject of conversation and in a hushed tone that I can hear Terry say "Ya she is ICC certified and would probably do like the guys who disappeared when they had to go into a bad neighborhood" This is word for word and designed to tank my chances at promotion.

258. I had been sent into the most dangerous neighborhoods to post tickets on occupied homes and then remain a target while I took a photo of the posted ticket.

259. In perfoming my duties I often had to walk past large crowds of drunk men.

260. I was not at all like those who walked off the job when they were sent into dangerous or disgusting situations.

261. While I was in dangerous neighborhoods trying to identify "fake" churches, Daryl was working in upper scale neighborhoods identifying Airbnb rentals.

262. While working with Mark Kincannon, I completed the ticketing list smartsheets for the 48224 Zip code survey.

263. The project I had set up was handed off to Donnie Wright on August 9, 2018.

264.   Donnie Wright did not know how to navigate the smartsheet or sort data and his lack of understanding caused signifcant data corruption. He was a young black male who I belive was not "Act 54" certified.

265.   July 9,2018 I overhear Terry Martin tell Donnie Wright "You are doing their training right, I don't want Trish involved.

266.   The message sent was that somehow the person who actually created the ticket list for the enforcement project was too dumb to explain it to new employees.

267.   Now I was being alienated from the newly hired ticket writers too.

268.   Just prior to my leaving the department Dorjan told me that he was directed by Terry not to talk to me.

269.   I immediately confronted Terry about his disrepectful treatment but it continued.

270.   July 10, 2018 Mark Kincannon told me payment for my 110 hours spent creating the databases for the zip code enforcement project was being denied.

271.   I was now being told I must report to Donnie Wright for direction on the project I had set up on my own time and had not even been paid for!

272.   August 15, Terry deliberately withheld my pay for the day and I would not be paid for 6 weeks.

273.   I filed a greivance about the missing pay with the union representative, Kevin Pierson and he did not submit my grievance

274.   Later, I spoke to Kevin Pierson about filing a grievance over the 110 hours of unpaid "comp" time.

275.   He was very interested in helping me with this grievance.

276.   I understood that if I filed, all building inspectors would have been eligible to collect the 110 hours because overtime was not distibuted.I

277.    could not accept that my grievance would entitle others, who had not worked to be unjustly enriched so I did not pursue the matter.

278.   On August 28, 2018 Kevin Pierson withnessed my ambush in Terrys office, He scolded me for not formally requesting his presence when I was called in to Terrys Martins office.I had no idea what I was walking in to nor that I should call the union.

279.   Terry threatened me with discipline for failing to follow Donnie Wright's orders.

280.   I told Terry Martin I had followed Donnie Wright's instruction to neither post nor mail my tickets.

281.   Terry said I should have come to him about Donnie Wright's order.

282.   I reminded Terry that I was instructed to report to Donnie

283.   Shortly after August 28,2018 I formally recind my union memebership as I am not in the habit of paying for services I do not receive and to stop the conversations with Kevin about the 110 hours

unpaid time.

284.   On September 19, 2018, what was the cruelest action to date, I was "accidentally" copied on an email sent by a manager to 3 supervisors and myself to facilitate the "smooth transfer' of Dorjan Samuels, a young black man, to the building inspector position I should be filling.

285.   I immediately responded and asked why after my multiple requests to be allowed to perform the job I was hired for would someone lesser qualified be promoted over me.

286.   I was asked to re-submit the credentials that were part of my record, I promptly replied and fully complied.

287.   Dorjan Samuels was promoted over me.

288.   Dorjan Samuels was hired in July of 2018. He started work as a ticket writer. He obtained his "Act 54" certification using his 10 years of experience installing cable tv service.

289.   On October 15, 2018 Lous Smith told me the "ticket writers" will be reassigned back to Ron Muir.

290.   I sent and email to Dave Bell and Dalip Patel tand ask to finally send me to Building inspections.

291.   I told Dave Bell  I will not allow Ron Muir to harrass me and "since the department will not stand up to him I will be forced to and I will most certainly defend myself."

292.   In Dave Bell's response to my request, he justified his not helping me by stating he had hired women as supervisors and managers.

293.   I didn't challenge the statement but never met any female supervisors except for admin supervisors.

294.   After my accusation of sexism, he did hire a woman to run the least desirable department in BSEED.

295.   In December and January, once the weather changed to snow, I was allowed to go out and conduct a blight survey.

296.   February 13, 2019, I visited my doctor because my Myasthenic episodes changed from cyclic, usually resolving in a few days to an ongoing fatigue that I could not shake.

297.   I had gained more than 40 lbs.

298.   He ran some tests and determined I was experiencing depression.

299.   I had a bout of depression when my daughter died 30 years prior.

300.   I realized this felt the same.

301.   I know I could no longer endure the job.

302.   I started to actively apply for other positions.

303.   In December of 2018 I interviewed with Dan Debardino and Glen Davis for a Mechanical Inspector Position.

304.    The interview changed direction from inquiring about my skills and abilities to how my FMLA leave would affect my attendance.

305.    I tried to deflect to question by referencing the brief FMLA leave I was taking to care for my husband after his surgery and I told them he should be recovered by the New Year.

306.    Not satisfied with the answer I gave I was asked again how "my" FMLA leave might interfere with my attendance.

307.    I believe they knew about my Intermittent FMLA leave.

308.    I believe I was denied the opportunity to perform Mechanical Inspections, at least in part because the intermittent nature of my leave that could potentially interrupt scheduling.

309.    Towards the end of the interview there was discussion about me replacing the current court officer Latisse Walton. My body language must have displayed lack of enthusiasm for the position.

310.    February 15,2019 Dave Bell and I are leaving the building at the same time.

311.    He asked me "how is it going?"

312.    Without thinking I responded, "not good, I never imagined I would do a job where I could be replaced with an algorithm."

313.    He said "well at least you get to go to court".

314.    As we arrived at our cars I asked if he would please process the application I submitted to become a third-party inspector and he asked in a surprised tone "you would be willing to leave your job with the city?

315.    I told him the only way I will be allowed to inspect buildings is to leave the city and I want to inspect buildings.

316.    He indicated he would support my application but later denied it citing "lack of construction experience"

317.    The denial deprived me of an alternate means of income when I was forced to quit my job.

318.    On February 27,2019 I became fully aware of how damaging the ticket writer assignment was to my career when I interviewed for a building inspector position in Royal Oak.

319.    My interview came to an abrupt close after I outlined my duties at BSEED.

320.    Kimberly asked me, did you ever actually inspect buildings at BSEED?'

321.    I explained that I conducted blight surveys where I looked for hazards.

322.    I was summarily dismissed with "Ok, so you were a code enforcement officer or housing inspector, we are looking for a building inspector"

323.    On March 4,2019 Dorjan Samuels and were discussing his promotion and he told me "I know they wanted you in Mechanical, they were just afraid of your FMLA"

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

324.   This was the last straw.

325.   I left BSEED.

326.   On March 4 I filed a complaint with CRIO.

327.   I spoke with Sylvia Williams. I told her I spoke with Lesa Kent about a year prior and she told me there was nothing "actionable" in my concerns of harassment.

328.   I shared a copy of the letter I sent to my supervisor Terry Martin and Dave Bell and shared with Lesa Kent.

329.   I told Sylvia Williams the harassment accelerated since my original conversation with Lesa Kent.

330.   I shared the original letter and examples of the continuing harassment. I asked that the unauthorized disclosure of privileged medical information be investigated.

331.   After she reviewed my information, I asked if she saw anything "actionable" and she said yes, and it included investigating why Lesa Kent did not follow up.

332.   I understood the investigation would take 60 days.

333.   I hoped that when the investigation concluded I would hear from BSEED and I would return to do the job I was hired to do.

334.   On May 5,2019 I reached out to Sylvia and learned she no longer worked in CRIO. She also told me Lesa Kent was now the manager.

335.   I asked if my claim had been investigated and she told me she would not comment as she no longer worked there.

336.   Sylvia Williams was investigating Lesa Kent's failure to act.

337.   It seemed pointless to ask Lesa Kent about the outcome of Sylvia Williams investigation as It was unlikely Lesa Kent would have pursued an investigation into her own failure.

338.   Given Lesa Kent was promoted to department manager the City was satisfied with her actions.

339.   Again no one helped.

---

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

**IV.    Exhaustion of Federal Administrative Remedies**

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

August 27, 2019

B.    The Equal Employment Opportunity Commission *(check one)*:

☐    has not issued a Notice of Right to Sue letter.

☒    issued a Notice of Right to Sue letter, which I received on *(date)*    07/19/2021    .

*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.    Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐    60 days or more have elapsed.

☐    less than 60 days have elapsed.

**V.    Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

1.    For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful;
2.    For lost wages and all other compensation denied or lost to Plaintiffs by reason of Defendants' unlawful actions, in an amount to be proven at trial;
3.    For compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to be proven at trial;
4.    For punitive damages in an amount to be determined at trial;
5.    For liquidated damages;
6.    For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;
7.    For reasonable attorney fees

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

☐    60 days or more have elapsed.

☐    less than 60 days have elapsed.

## V.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

1.    For a declaration that Defendants' actions, policies, and practices as alleged herein are unlawful;

2.    For lost wages and all other compensation denied or lost to Plaintiffs by reason of Defendants' unlawful actions, in an amount to be proven at trial;

3.    For compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to be proven at trial;

4.    For punitive damages in an amount to be determined at trial;

5.    For liquidated damages;

6.    For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

7.    For reasonable attorney fees

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:   October 17, 2021

Signature of Plaintiff    _Trish Cunningham_

Printed Name of Plaintiff    Trish Cunningham

### B.    For Attorneys

Date of signing:    _____

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

---

## DISMISSAL AND NOTICE OF RIGHTS

---

To:  **Trish Cunningham**
 **18530 Mack Ave.**
 **Grosse Pointe, MI 48236**

From:  **Detroit Field Office**
 **477 Michigan Avenue**
 **Room 865**
 **Detroit, MI 48226**

| | |
|---|---|
| ☐ | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **471-2020-00729** | **Michael Huffman,**<br>**Investigator** | **(313) 226-2290** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒  The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Deanna E. Wooten*  Digitally signed by Deanna E. Wooten
Date: 2021.07.19 17:09:50 -04'00'

Enclosures(s)

*For* **Michelle Eisele,**
**District Director**

*(Date Issued)*

cc:  **Attorney Andrae Smith**
 **City of Detroit Law Department**
 **2 Woodward Avenue Suite 500**
 **Detroit, MI 48226**

 **Attorney Maia Johnson Braun**
 **Gold Star Law**
 **2701 Troy Center Drive**
 **Suite 400**
 **Troy, MI 48084**

Enclosure with EEOC
Form 161 (11/2020)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to
consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or
record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you
did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was
*issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate
State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter
alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office.  If you have simple questions, you usually can get answers from the
office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or
make legal strategy decisions for you.

## PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
<u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

## ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above,
because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge
file, **please make your review request <u>within 6 months</u> of this Notice**.  (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Trish Cunningham
18530 Mack ave #304
Grosse Pointe MI 48236

**DEFENDANTS**
City of Detroit Buildings Safety Engineering and Environmental Department and Office of Inclusion and Opportunity
2 Woodward ave. Suite 500

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Wayne
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☒ 3  Federal Question *(U.S. Government Not a Party)*
☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' / Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability / ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine / Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / ☐ 370 Other Fraud | ☒ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | Product Liability / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 196 Franchise | Injury / ☐ 385 Property Damage | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | |
| | ☐ 362 Personal Injury - Medical Malpractice / Product Liability | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment / ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the civil Rights act, Americans with disabilities act Age discrimination act
Brief description of cause:
Employment discrimination

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____
DOCKET NUMBER _____

DATE  Oct 18/2012
SIGNATURE OF ATTORNEY OF RECORD  _Trish Cunning_  pro se

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____